**FORD MOTOR COMPANY,**
**Plaintiff-Appellee,**

v.

**PLANT PROTECTION ASSOCIATION NATIONAL, Defendant-Appellant.**

**No. 84–3718.**

United States Court of Appeals,
Sixth Circuit.

Argued May 2, 1985.

Decided Aug. 13, 1985.

John P. Malone, Jr., argued, Cleveland, Ohio, for defendant-appellant.

Ronald L. Coleman, argued, Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiff-appellee.

Before LIVELY, Chief Judge, MARTIN, Circuit Judge, and TIMBERS, Senior Circuit Judge *.

LIVELY, Chief Judge.

In this case the court must determine whether two awards of an arbitrator drew their essence from a collective bargaining agreement between Ford Motor Company (Ford) and Plant Protection Association National (PPA). This is a recurring issue in the federal courts and the guiding principles have been established in decisions of the Supreme Court and this court. The particular circumstances in a given case can make application of these principles problematic.

## I.

### A.

Ford and PPA entered into a collective bargaining agreement which was effective

---

* The Honorable William H. Timbers, Senior Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

for three years beginning in late 1979. The agreement covered all plant security guards in three Ford plants at Monroe, Northville and Ypsilanti, Michigan. In late 1981 Ford decided to close the Northville plant because it was technologically outdated. However, following negotiations with the United Auto Workers, it was determined that the plant would remain open with reduced operations. Ford then decided that it no longer needed plant security guards at Northville, and it contracted with a private company, Guardian, to install and monitor an electronic burglar and fire alarm system. After this system was installed Ford transferred the Northville plant security guards, who were PPA members, to the Ypsilanti plant.

PPA filed two grievances claiming (1) that its members were being transferred and their functions at Northville were being assumed by non-PPA members in violation of the collective bargaining agreement; and (2) that the installation of the electronic security system monitored by non-PPA personnel violated a contractual prohibition against using outside agencies to perform security functions historically performed by unit members and a Ford policy of not using non-PPA personnel for work normally and traditionally assigned to members of the union.

Ford denied both grievances. With regard to the first grievance, Ford asserted that no "security rounds" were being made at the Northville plant and, thus, the transfers were in compliance with the agreement. As to the second grievance, Ford stated that there had been no improper assignment of work since the electronic system did not require the type of physical presence-monitoring performed by PPA members, and that it alone had the right under "management rights" provisions of the agreement to determine the kind and degree of security required at a given plant.

**B.**

The positions of the parties focused on several particular provisions of the collective bargaining agreement. In Article I of the agreement Ford recognized PPA as the exclusive bargaining agent of included employees for "rates of pay, wages, hours of employment, and other conditions of employment." In Article V, PPA recognized Ford's "Rights of Management." In pertinent part, Article V provided:

## RIGHTS OF MANAGEMENT

The Union recognizes that the management of the Company's business, including the hiring of employes and the maintenance of order and efficiency in its plants and operations, is the sole responsibility of the Company and that the Company must be free to exercise these rights effectively, as hereinafter provided. In recognition of these principles, the following provisions are agreed to:

*Section 1: General*

The Company retains the sole right to hire, layoff and assign employes and to determine the starting and quitting time and the number of hours to be worked subject only to such regulations and restrictions governing the exercise of these rights as are expressly provided in this Agreement.

\* \* \* \* \* \*

*Section 4: Protection of Property*

The Company retains the sole responsibility to determine the methods and means by which, and the extent to which, its property shall be protected, and its rules shall be enforced and, subject only to such restrictions as may be expressly provided by this Agreement, retains the sole responsibility to assign the duties, posts and responsibilities to employes.

\* \* \* \* \* \*

*Section 6: Retention of Rights*

It is understood and agreed that any of the powers and authority the Company had prior to the signing of this Agreement are retained by the Company excepting those specifically abridged or granted by this Agreement.

The grievance procedure, culminating in binding arbitration, was set out in Article IV of the agreement. The following provisions of Article IV, Section 7 are pertinent to the positions of the parties:

*Section 7: Powers of Arbitrator*

(a) It shall be the function of the arbitrator, and he shall be empowered, except as his powers are limited below, after due investigation to make a decision in cases of alleged violation of the terms of this Agreement.

(1) He shall have no power to add to, or subtract from, or modify any of the terms of any agreement.

\*   \*   \*   \*   \*   \*

(3) He shall have no power to substitute his discretion for the Company's discretion in cases where the Company is given discretion by this Agreement or by any supplementary agreement, except that where he finds a disciplinary layoff or discharge is in violation of the standards set up in this Agreement, he may make appropriate modifications of the penalty.

(4) He shall have no power to decide any question which, under this Agreement, is within the responsibility of Management to decide. In rendering decisions, an arbitrator shall have due regard to the responsibility of Management and shall so construe the Agreement that there will be no interference with such responsibilities except as they may be specifically conditioned by this Agreement.

(b) In the event that a case is appealed to an arbitrator on which he has no power to rule, it shall be referred back to the parties without decision or recommendations on its merits.

\*   \*   \*   \*   \*   \*

(d) There shall be no appeal from an arbitrator's decision. It shall be final and binding on the Union, its members, the employe or employes involved and the Company. The Union shall not encourage any of its members, in any appeal to any court or Labor Board, from a decision of an arbitrator.

PPA also relied on a group of letters from Ford to the union bearing the same date as the collective bargaining agreement. Letter No. 10 concerned the use of non-PPA members to perform tasks "normally and historically" assigned to PPA members:

During recent negotiations, the Union expressed concern that the Company had made use of Supervisors, other non-bargaining employes and outside agencies to perform security and fire protection duties which have historically been performed by the bargaining unit in those plants in which the PPA is the certified Collective Bargaining Agent.

The parties understand that certain other security and fire protection functions, including fire prevention work has been assigned to both included and excluded employes. However, it is the policy of the Company that under normal circumstances excluded employes or employes of outside agencies will not be utilized to perform work which has been normally and historically assigned to members of the bargaining unit at those locations in which the PPA is the representative.

Letter No. 14 concerned the use of new technology:

During these negotiations, the Union expressed concern regarding the potential impact of new technology on employes and on the scope of the bargaining unit. This is to advise that where the introduction of new or advanced technology at a plant location affects the job responsibilities of included employes, local management will discuss the matter with the Union. Such discussion will take place in advance of implementation of such technological change as is practicable.

**II.**

**A.**

After grievance procedures failed to resolve the dispute, Ford and PPA presented it to an arbitrator. The arbitrator conclud-

ed that the letters were part of the collective bargaining agreement and that while the agreement did not explicitly prohibit subcontracting, Letter No. 10 stated Ford's policy not to subcontract PPA work "under normal circumstances." The arbitrator also found that Ford agreed in Letter No. 14 to meet and discuss new technology with PPA before adopting it. In his decision the arbitrator found that the installation of the security system affected "integral working conditions of the unit" and changes in working conditions that required bargaining. The award ordered the former Northville PPA members returned to the Northville plant and any loss in wages or seniority restored. The arbitrator did not order Ford to remove the electronic system, but concluded that it "would be patently unfair to stand idly by while the bargaining unit was wiped out."

Ford returned the PPA members to the Northville plant in compliance with the award. However, Ford next placed the devices which monitored the Northville electronic system in its Ypsilanti plant and again transferred Northville PPA members to Ypsilanti where they were given responsibility for monitoring the Northville electronic security system.

### B.

PPA then filed suit in district court charging that Ford had not complied with the arbitration award. When Ford and PPA agreed to submit the compliance issue to arbitration before the same arbitrator, the complaint was dismissed without prejudice. At a new hearing before the arbitrator the parties disagreed on whether Ford had "discussed" the electronic system and its monitoring as required by the first award or had "bargained" on this issue. The second award did not settle this question, though the arbitrator set forth the respective positions of the parties in his opinion. In the opinion the arbitrator stated that the only issue was whether Ford had complied with the first award. The arbitrator found that Ford had not complied.

The arbitrator went on to hold that Ford was doing indirectly what it was forbidden to do directly—abolishing PPA positions at Northville. The arbitrator concluded that Ford "wittingly or unwittingly took advantage of the unsophistication of the Union" and that he was compelled to "evaluate the relative bargaining strength of the two parties." He ordered Ford to "bargain such changes affirmatively" and to refrain from taking advantage of the union. In his award the arbitrator ordered Ford to return three PPA members to the Northville plant "to perform the security functions there" and to pay damages to individual members of the Northville PPA unit.

The arbitrator found the principle that "security is basically a management concern" to be subject to the risk of possible "scrutiny by a third person," the arbitrator. He concluded that bargaining was required because there was a change in working conditions and Ford had not shown such a change in circumstances (*i.e.*, an abnormal condition) as to make bargaining unnecessary.

### C.

Ford filed suit in district court pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1982), and the Arbitration Act, 9 U.S.C. §§ 1–14 (1982), to vacate both awards. On cross-motions for summary judgment the district court held that neither award was enforceable. This was so, the district court found, because neither drew its essence from the collective bargaining agreement as required by settled law. *E.g.*, *W.R. Grace & Co. v. Local 759, Rubber Workers*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960); *District 30, United Mine Workers v. Sovereign Coal Corp.*, 750 F.2d 37, 39 (6th Cir.1984). The district court also found that the arbitrator had ignored completely Article V of the collective bargaining agreement which contained the management rights provisions. The district court found that Section 4 of

Article V by which Ford retained sole responsibility to determine "the methods and means by which, and the extent to which, its property shall be protected" was unambiguous and controlling. The district court also held that the arbitrator's reliance on Letters Nos. 10 and 14 was "misplaced."

The memorandum opinion of the district court is disturbing. At the very beginning the memorandum describes as "undisputed facts" statements which Ford made in its presentation to the arbitrator. In fact, these statements related to the sharply disputed question of whether Ford had discussed with PPA the issue of monitoring the electronic burglar and fire alarm system and whether this monitoring was being performed exclusively by PPA members. In addition, the memorandum stated as an undisputed fact that Ford's assignment of monitoring responsibilities "did not affect adversely the bargaining unit or any employee." Again, this was a disputed issue and the arbitrator made no such finding.

### III.

■ The role of the courts "in the context of collectively bargained-for arbitration should be 'strictly confined.'" *National Post Office, etc., Union v. United States Postal Service,* 751 F.2d 834, 840 (6th Cir.1985), quoting *Steelworkers v. Warrior & Gulf Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Both the Arbitration Act and case law have emphasized the limited role of the judiciary. Finality is one of the most appealing attributes of arbitration and lengthy court proceedings rob arbitration of this desirable feature. The courts may not second guess an arbitrator with respect to his interpretation of a collective bargaining agreement or the merits of a case presented to the arbitrator for decision. *General Telephone Co. of Ohio v. Communications Workers,* 648 F.2d 452, 456 (6th Cir. 1981). As Justice Stewart wrote for this court in *National Post Office, supra,* after quoting from the *Steelworkers Trilogy:*

> Consequently, an arbitrator's decision is entitled to great deference and generally should be upheld absent irrationality or disregard of plain and unambiguous language in the agreement.

751 F.2d at 840. The arbitrator's interpretation of a contract is what the parties bargain for when they agree to arbitration. The Supreme Court wrote in *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983), "a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." An arbitrator is permitted to construe any provision of the contract which is ambiguous or unclear in context. But the corollary is also true; an arbitrator is bound by the plain and unambiguous provisions of an agreement. *Detroit Coil Co. v. International Ass'n of Machinists,* 594 F.2d 575, 579 (6th Cir.), *cert. denied,* 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

### A.

■ The district court erred in holding that the arbitrator's first decision and award did not draw their essence from the collective bargaining agreement. The arbitrator did not completely ignore the management rights clause. Noting Ford's position on the two grievances, the arbitrator quoted from Article V of the agreement and set Section 4 out verbatim. The arbitrator was clearly aware of the contractual provisions giving management the right to make decisions about security at the Ford plants. However, the arbitrator concluded that Letter No. 10 modified the management rights clause and that the letter was unclear as to the meaning of "normal circumstances." The arbitrator then interpreted the contract, including Letter No. 10, to mean that "barring abnormal occurences [sic], the company would attempt to make sure that unit work, however ill-defined, would be assigned to the bargaining unit." Upon finding that the PPA members at Northville performed "a plethora of responsibilities," the arbitrator ordered the

three plant security guards returned to that plant.

■ The arbitrator also found that Letter No. 14 recognized Ford's responsibility to meet and discuss the matter of new technology with the union. Implicit in the arbitrator's recital of this fact is a requirement that Ford not take further actions based on the availability or installation of such technology without prior discussions with the union where such actions affect PPA members.

The arbitrator's first decision and award were not irrational. The arbitrator noted that Letter No. 10 was dated the same day as the collective bargaining agreement and was written in response to the union's concern that Ford had used non-PPA personnel for security work. He acted within his authority in interpreting Letter No. 10 as modifying Ford's right to make decisions on the assignment of work and the method and degree of security required. As this court stated in *Timken Co. v. Steelworkers*, 492 F.2d 1178, 1179 (6th Cir.1974), referring to a management rights clause:

> It cannot follow from such reserved power that a legitimate dispute could not arise with respect to the method or manner in which the company should exercise its managerial functions or the imposition of penalties in individual cases.

When one provision of an agreement gives sole authority over certain decisions to one party and another provision demonstrates an intention to place limitations on the exercise of that authority on the basis of historical practices, an ambiguity is created. The arbitrator's interpretation under such circumstances may not be overruled by a court. The arbitrator resolved the ambiguity by noting that many security functions traditionally performed by PPA members still existed at Northville and ordered the three plant guards restored to their positions there. This remedy was within the arbitrator's broad discretion. *General Telephone Co. of Ohio v. Communications Workers*, 648 F.2d at 457.

**B.**

■ The arbitrator's second decision and award stand on a different footing. There the only issue was whether Ford had complied with the first award. In concluding that Ford had not complied the arbitrator found that Ford had not "bargained affirmatively" on the issue of new technology. There was nothing in the agreement, including Letter No. 14, which required Ford to bargain either affirmatively or otherwise on this matter. Letter No. 14 merely required Ford to discuss the matter with PPA in advance of implementation where practicable, if the introduction of new or advanced technology affected the job responsibilities of unit employees. The arbitrator exceeded his authority in requiring Ford to bargain affirmatively as part of the second award. Federal labor law does not require affirmative bargaining, or bargaining to agreement; it merely requires good faith bargaining. 29 U.S.C. § 158(d) (1982). This award imposed an obligation on Ford not found in the agreement or required by law.

■ Further, this award appears to be based on the arbitrator's conclusion that a perceived inequality in sophistication and bargaining strength between Ford and the union gave him the right to impose conditions to which the parties did not agree. The Wagner Act corrected the inequality between employers and individual employees in providing for collective representation of employees by their chosen bargaining agents. An arbitrator may not ignore or add to the terms of a collective bargaining agreement because of a perceived lack of sophistication on the part of the union or his evaluation of the relative bargaining strength of the parties. In doing so the arbitrator in the present case violated the clearly-established prohibition against dispensing "his own brand of industrial justice." This limitation on the authority of an arbitrator was forcefully stated in *Enterprise Wheel & Car Corp.*:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his

**76**

informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.

363 U.S. at 597, 80 S.Ct. 1361.

To the extent the second decision found that Ford had failed to comply with the first award and ordered three PPA members back to Northville to perform security functions there, it must be enforced. This is consistent with the first decision and the arbitrator's interpretation of the collective bargaining agreement to preclude Ford from assigning to others functions traditionally performed by PPA members. To the extent the decision required Ford to "bargain affirmatively" before monitoring the Northville electronic system from Ypsilanti, it cannot be enforced. Ford was only required to discuss this change with PPA, not bargain to agreement before implementing it. The award of back wages to PPA members is not supported by any proof in the record before us. From all that appears the PPA members worked throughout this controversy either by "making rounds" at Northville or by monitoring the Northville electronic system from Ypsilanti. The record identifies no lost wages.

The judgment of the district court is reversed. The case is remanded for entry of judgment enforcing the awards to the extent indicated and denying enforcement to those provisions identified herein. If PPA contends that portions of the record not forwarded to this court support the award of back wages, this matter should be presented to the district court on remand. PPA will recover its costs on appeal.