**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 05a0470n.06**
**Filed: June 7, 2005**

**No. 03-2451**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| BIXBY MEDICAL CENTER, INC. AND HERRICK MEMORIAL HOSPITAL, INC., | ) ) ) | |
| *Plaintiffs-Appellants*, | ) ) | |
| v. | ) ) ) | On Appeal from the United States District Court for the Eastern District of Michigan |
| MICHIGAN NURSES ASSOCIATION, | ) ) | |
| *Defendant-Appellee.* | ) ) | |

**Before:**  **BOGGS, Chief Judge; and KENNEDY and MARTIN, Circuit Judges.**

**BOGGS, Chief Judge.**  Plaintiffs appeal the district court's decision to enforce an arbitration award entered in favor of the Defendants. After reviewing the agreement and the arbitrator's award, we believe the arbitrator's conclusion that the grievances that prompted this case were timely filed and her award ordering the Plaintiffs to stop any further unilateral changes in insurance coverage draw their essence from the agreement. We therefore affirm.

**I**

This dispute arises from changes in the health insurance program at the Bixby Medical Center ("Bixby") and Herrick Memorial Hospital ("Herrick") (collectively, "the Hospitals"). Defendant Michigan Nurses Association ("MNA") represents the nurses in both Hospitals and, at the time these

disputes arose, did so through two separate bargaining units. The relationship between Bixby and its nurses was controlled by a Collective Bargaining Agreement that was in effect from October 1, 1997 to June 30, 2000 ("Agreement"). A similar Collective Bargaining Agreement ("Herrick Agreement"), effective from December 7, 1999 to October 31, 2002, governed the relationship between Herrick and its nurses.[1] *See* J.A. 131-65. Both of these agreements covered the Hospitals' insurance obligations to the nurses, and they also had nearly identical grievance procedures. As of July 1, 2001, the two MNA bargaining units have been consolidated into one, and nurse-hospital relations are governed by an agreement between MNA and the Lenawee Health Alliance (the "Lenawee Agreement"), an organization containing both Bixby and Herrick.

The Hospitals decided to change aspects of their health insurance coverage effective as of January 1, 2000. Some of these changes decreased coverage. For example, the Hospitals increased prescription co-payments by 50%. Other changes increased coverage; under one of the plan's options, the Hospitals lowered coverage deductibles from $200 to $150 for singles and from $400 to $300 for families. The leaders of the Bixby and Herrick bargaining units filed two nearly identical "class action" grievances in late August and early September 2000 challenging these changes in coverage. The Hospitals denied both grievances on the substantive ground that the Agreement's provisions did not require the hospital to maintain a consistent level of health insurance coverage and on the procedural ground that the grievances were untimely. The parties appeared before an

---

[1]The parties and arbitrator primarily discuss the Bixby agreement. Our decision is the same under both opinions and we see no reason to alter their terminology. For this reason, we refer to the contract between Bixby and MNA as the Agreement.

arbitrator on August 21, 2002. The arbitrator issued an opinion and award in which she determined that the grievances were timely filed and ordered the Hospitals to no longer make any unilateral changes to their insurance coverage.

Subsequently, the Hospitals filed a claim in federal district seeking to vacate the award. MNA counter-claimed, requesting that the award be enforced and that the case also be remanded to the arbitrator for further inquiry into remedies. Both parties brought motions for summary judgment. The district court issued an oral opinion upholding the arbitrator's award but denying MNA's request to remand.

Plaintiffs have timely appealed to this court, challenging whether the grievances were filed in a timely manner and whether the arbitrator's remedy departs from the contract. Though defendants cross-claimed at the district court level, they do not cross-appeal to this court.

## II

We review *de novo* the district court's grant of summary judgment in an arbitrated labor dispute. *Eisenmann Corp. v. Sheet Metal Workers Int'l Assoc. Local No. 24*, 323 F.3d 375, 380 (6th Cir. 2003). Our review of the arbitrator's decision itself, however, is strikingly deferential. *Ibid.* We review the arbitrator's award and reasoning "*only* to determine whether the arbitrator was 'arguably construing or applying the contract and acting within the scope of his authority.'" *Beacon Journal Publ'g Co. v. Akron Newspaper Guild*, 114 F.3d 596, 599 (6th Cir. 1997) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987)); *Int'l Ass'n of Machinists and Aerospace Workers v. Lourdes Hosp.*, 958 F.2d 154, 156 (6th Cir. 1992). To this end, we inquire

- 3 -

whether the arbitration award "draws its essence from the collective bargaining agreement." *Beacon Journal*, 114 F.3d at 599 (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Co.*, 363 U.S. 593, 597 (1960)). To assist us in this inquiry, this court has identified four factors to consider when deciding whether an award fails to "draw its essence" from the agreement: "1) it conflicts with express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on general considerations of fairness and equity instead of the exact terms of the agreement." *Id.* at 600 (citations omitted). Though we have commented that our review is not toothless when the arbitrator completely disregards the contract, *id.* at 599, we are guided in our review by the Supreme Court's persistent reminder that "if an 'arbitrator is even arguably construing or applying the contract . . . ,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.'" *Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 509 (2001) (per curiam) (quoting *Eastern Associated Coal Corp. v. United Mine Workers*, 531 U.S. 57, 62 (2000) (quoting *Misco*, 484 U.S. at 38)).

**A**

We initially conclude that the grievances were timely filed. We begin by looking at the arbitrator's opinion because it is her reasoning that we are called on to review. *See ibid.* (emphasizing the deferential standard of review applied to the arbitrator's contractual interpretation). After summarizing the Hospital's evidence as to timeliness, the arbitrator concluded that *MNA*, as distinct from the insured individual, only learned of the changes in health insurance coverage in late August or early September and that *it* filed the grievances timely thereafter. Such a conclusion

- 4 -

allows only one interpretation of the arbitrator's reasoning: she concluded that MNA had an independent right under the Agreement to follow the grievance procedure laid out in the Agreement. Only then is it relevant for the arbitrator to inquire into when MNA first learned of the changes and the relation of the union's discovery and its subsequent filing of the grievances.

Thus, we must inquire whether the arbitrator's reasoning that MNA had an independent right to file grievances "draws its essence from the collective bargaining agreement." *Wyandot, Inc. v. Local 227, United Food and Commercial Workers*, 205 F.3d 922, 927 (6th Cir. 2000) (applying the standard to timeliness challenge).[2] The Agreement is naturally, and necessarily, our lodestar in resolving this question. Several sections of the Agreement's grievance procedure follow:

> Section 6.0.  Purpose of Grievance Procedure. *It is the intent of the parties hereto that the Procedure set forth herein shall serve as a means for the peaceful settlement of all disagreements that may arise between them concerning the interpretation or application of this Agreement, without any interruption or disturbance of any sort whatsoever in the normal operation of the Center. Nurses are required to follow and use this Procedure* in case they have any grievances concerning the interpretation or application of this Agreement . . . .
>
> Section 6.1. Definition of Grievance.  A grievance under this Agreement is a dispute, claim or complaint arising under and during the term of this labor Agreement. Grievances are limited to matters of interpretation or application of this Agreement . . . .
>
> Section 6.2.  Steps of Grievance Procedure. *If a Nurse has such a grievance*, it shall be handled in the following manner, each successive Step to be followed unless the grievance was settled or abandoned at the preceding Step, and if a written grievance

---

[2]Appellee argues that, as deferential as this standard is, it is not deferential enough for a challenge to the arbitrator's decision on whether an award was timely.  MNA classifies such objections as procedural and therefore argues that our review of the arbitrator's decision concerning such issues is only for bad faith or misconduct.  Because we affirm the arbitrator's decision according to the standard of review decided in *Wyandot*, we need not revisit our previous holding.

is settled at any Step, its disposition shall be signed by the employee or by his/her Staff Council representative who acted for her.

> (a) <u>Step 1.</u> A verbal discussion between the employee and his/her Department Director or designee shall take place within five (5) days after the occurrence, or within five (5) days after the date the employee should reasonably have known of the occurrence. . . .

. . .

<u>Section 6.5. Timeliness</u>.

> (a) No grievance shall be considered at any Step unless it is filed and processed within the respective time limits according to the Procedure set forth in this Agreement, unless extended by mutual written agreement. . . . *Failure to comply with the time limit for the first (1st) Step shall be deemed waiver of the grievance.*

J.A. 87-90 (emphases added). We believe that the grievance procedure, read as a whole, can be construed as allowing MNA to independently file grievances. The parties stated in § 6.0: "It is the intent of *the parties* . . . that the [grievance p]rocedure . . . shall serve as a means for the peaceful settlement of *all disagreements* that may arise between *them* concerning the interpretation or application of this Agreement. . . ." MNA is a party to the Agreement both implicitly, as the representative of the employees in the bargaining unit, and explicitly, as one of the stated parties to the agreement. This language could therefore be read as contemplating MNA having an independent right to use the grievance procedure. Section 6.1, where the parties define a grievance, offers no reason to believe that MNA would not have a right to file its own grievances.

Rather, the only language suggesting MNA cannot individually challenge the Hospitals' actions via the grievance procedure is that found in the many sub-sections of § 6.2, which lay out the individual steps a grievant must take in pursuing a grievance to cooperative settlement or arbitration.

The language in this section clearly speaks to steps taken by a singular nurse pursuing a grievance. But in the context of a labor Agreement, it is not beyond doubt that such terms should be meant to preclude the ability of the nurses' labor representative, MNA, from filing grievances. Moreover, as discussed above, sections of the Agreement itself provide affirmative guidance that MNA can independently pursue grievances. The parties, of which MNA is one, wrote that the grievance procedure would be a way for the parties to resolve disputes "that may arise between *them*." J.A. 87 (emphasis added). The Agreement's definition of a grievance in no way excludes MNA from being able to file one. Section 6.0 provides us with additional reason to believe MNA can independently file grievances in that it obligates nurses to follow the grievance procedure listed in § 6.2. It is therefore of little wonder that § 6.2 begins detailing the steps to be taken ""[i]f a *[n]urse* has such a grievance . . . ." One could construe the nurse-specific language in § 6.2 as simply directed at the common occurrence of an individual nurse filing a grievance, as the Agreement requires nurses to follow the procedure laid out in the section.

Because the grievance procedure is ambiguous about who can file grievances, the arbitrator was construing the agreement in determining that MNA can independently pursue a grievance according to the procedure. This is certainly not the only possible interpretation of the Agreement. But our deferential standard of review prohibits inquiry into what would be the best interpretation of the parties' grievance procedure. We are bound to inquire only whether the arbitrator was arguably construing the agreement. *Garvey*, 532 U.S. at 509; *see also ibid.* ("It is only when the arbitrator strays from interpretation and application of the agreement . . . that his decision may be unenforceable.") After reviewing the arbitrator's reasoning and the Agreement between the parties,

we can only conclude that she was construing the parties' agreement. It is not our place to disturb the arbitrator's interpretation.

In reaching this conclusion, we cast no doubt on our previous decision in *Wyandot*, 205 F.3d 922. In *Wyandot*, the union filed a grievance on the employee's behalf seventeen days after her termination, which violated the plain terms of the grievance procedure that required any possible grievance to be initiated within a five-day window. *Id.* at 924-25. In concluding that the grievance had been timely filed, the arbitrator, we held, had disregarded the plain and unambiguous terms of the agreement. *Id.* at 929-30. We would reach the same conclusion in this case if the arbitrator had concluded that MNA's grievances were timely filed despite stating that the union had failed to follow the steps in the grievance procedure. But the arbitrator made no such conclusion and the Hospitals do not make any such allegation. Rather, unlike in *Wyandot*, the question is whether MNA, under the particular agreement it signed with the Hospitals, had an independent right to file grievances, not whether the party followed the procedures. The arbitrator was arguably construing the contract in concluding that MNA had that right.

The only question as to whether MNA followed the grievance procedure in this case is whether the arbitrator correctly concluded that it only had notice of the changes in late August or early September. We further affirm the arbitrator's conclusion that MNA followed the grievance procedure by timely filing its grievances within five days of learning of the changes. Whether the Hospitals notified MNA of the changes before late August or early September is a factual question for which our review is even more circumscribed. *See Garvey*, 532 U.S. at 509 ("When an arbitrator resolves disputes regarding the application of a contract, . . . the arbitrator's 'improvident, even silly,

factfinding' does not provide a basis for a reviewing court to refuse to enforce the award.") (quoting *Misco*, 484 U.S. at 39). The arbitrator decided that the Hospitals' possible earlier notification to the nurses individually did not constitute notice to the MNA leadership, who remained unaware of the changes until late August or early September. Therefore, the arbitrator concluded, MNA could file a grievance within five days of its leadership's discovery. Regardless of whether we would have reached the same conclusion, we will not disturb the arbitrator's factual determination. Therefore, the arbitrator was "arguably construing or applying the contract," in deciding that MNA's grievances were timely. *Beacon Journal*, 114 F.3d at 599 (quoting *Misco*, 484 U.S. at 36).

**B**

We further conclude that the arbitrator's award of relief draws its essence from the agreement. The Supreme Court has cautioned courts to be deferential when reviewing the remedies ordered by an arbitrator:

> [A]n arbitrator . . . is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency.

*United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960), *quoted in Misco*, 484 U.S. at 41. The Court has since reiterated the limited role courts play in this area, noting that "where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *Misco*, 484 U.S. at 38, *quoted in Armco Employees Indep. Fed'n, Inc. v. Armco Steel Co.*, 65 F.3d 492, 496 (6th Cir. 1995). Even applying such deference, this court has had occasion to vacate an arbitrator's award

when his award sanctions an employer for conduct concerning a right given unquestionably to the employer. *See Beacon Journal*, 114 F.3d at 600 ("Beacon Journal has the exclusive right to schedule vacations. Consequently, [it] did not violate a specific provision of the collective bargaining agreement by doing something it had a right to do . . . ."); *Lourdes Hosp.*, 958 F.2d at 157 ("We do not believe that the exercise of a right specifically given in the bargaining agreement, the right to schedule, can be abused or that a remedy exists for such an alleged abuse.").

In the present case, the Agreement contains two sections relevant to the level of health insurance benefits. Under § 12.2 of the Agreement, nurses are to receive the same health insurance as all other employees. Section 12.7, however, states that the Hospitals retain the right to select or change insurance carriers, or to become a self-insurer, "provided the level of such benefits remains substantially the same." J.A. 104. The arbitrator construed the Agreement, in light of these two sections, to mean that the Hospitals had an obligation to maintain substantially the same level of benefits even absent a change in carriers. This is a fair construction of the parties' agreement. As "it is the arbitrator's view . . . of the meaning of the contract that [the parties] have agreed to accept," we will not question the arbitrator's interpretation. *Misco*, 484 U.S. at 37-38.

The arbitrator was still faced with an unanticipated circumstance. *See Enter. Wheel*, 363 U.S. at 597 (noting that a particular dispute may raise questions the contract does not resolve). As happened here, some individual changes in insurance coverage increased healthcare benefits while others decreased benefits. *See* part I, *supra.* In evaluating a set of changes, it is often unclear whether the overall level of benefits remains "substantially the same." Faced with this difficulty, the arbitrator "reach[ed] a fair solution" to the problem. *Misco*, 484 U.S. at 41 (quoting *Enter.*

*Wheel*, 363 U.S. at 597). To insure that the level of benefits remained substantially the same, the arbitrator ordered only prospective relief to MNA. She ordered that, going forward, the Hospitals must provide MNA with notice of what changes it wishes to make to its insurance coverage and must obtain MNA's consent before making such changes. In these negotiations, the arbitrator decided, the standard would be whether benefits remain substantially the same.

The arbitrator's remedy does no violence to the parties' agreement. Unlike the situations presented in *Beacon Journal*, 114 F.3d at 600, and *Lourdes Hospital*, 958 F.2d at 157, and contrary to the Hospitals' argument, the Hospitals did not have the unfettered right under the Agreement to change insurance *coverage*. The Agreement gave them a right to change only insurance *carriers*, provided that coverage would remain substantially the same. The Agreement is silent on what must be done when the Hospitals change benefits but keep the same carrier.[3] This gap in the Agreement is the sort of "particular contingency" to which an arbitrator's "informed judgment" should be brought to bear. *Enter. Wheel*, 363 U.S. at 597. The arbitrator made sure to indicate that the standard in such negotiations was still that benefits would remain substantially the same. There is no reason that the Hospitals could not seek arbitration if MNA's negotiating proved unreasonable.

---

[3]Section 12.7 dictates that, should the Hospitals attempt to change insurance carriers, the Hospitals must provide written notice to MNA and, if asked to by the union, "explain and discuss all matters related to a change of carriers." We hesitate to read those procedures as unequivocally binding on how the hospitals and union will proceed on changes in health insurance without any change in insurance carrier. Moreover, even were we to read the steps set forth in § 12.7 to apply to situations where the employer alters insurance coverage without changing the insurance carrier, we are not convinced that the Hospitals discharge their obligation to "explain and discuss" changes with the union if they fail to secure MNA's consent to changes in coverage. More to the point, an arbitrator would be "arguably construing or applying the contract" in concluding consent was necessary. *Misco*, 484 U.S. at 38.

No. 03-2451
Bixby Med. Ctr. v. Mich. Nurses Ass'n

The arbitrator's remedy is "a fair solution" to the problem presented, *ibid.*, and we will not question it.

In crafting a remedy that serves to effectuate the arbitrator's interpretation of the contract, that the Hospital must maintain substantially the same level of benefits, the arbitrator's award "draws its essence from the collective bargaining agreement," and therefore, "the award is legitimate." *Misco*, 484 U.S. at 36.

### III

For the reasons stated above, we AFFIRM the judgment of the district court.

No. 03-2451
Bixby Med. Ctr. v. Mich. Nurses Ass'n

Kennedy, Circuit Judge, concurring in part, and dissenting in part. I agree with the majority that the arbitrator was entitled to conclude that the employer had agreed in Section 6.0 to settle all disagreements between it and the union by arbitration and that, in the absence of a provision governing the procedure to be used when the union itself files a grievance against the employer, the procedure provided for arbitration by nurses would be utilized insofar as its specific provisions were not inappropriate for resolving a dispute between the union and the employer. However, because I believe that the arbitrator's remedy requiring the employer to obtain the union's consent before implementing a change in benefits does not derive its essence from the agreement, but rather adds an additional requirement not provided for in the agreement based upon the arbitrator's view of industrial justice, I respectfully dissent.

Section 12.7 of the collective bargaining agreement reserves to the employer the right to change insurance carriers provided that the level of benefits remain substantially the same. Moreover, this section provides that before the employer may implement a change in carriers, the employer must provide the union with notice, and, upon a request from the union, to explain and discuss with the union all matters related to the change. The arbitrator interpreted this section as providing an implied requirement that the employer must keep benefits substantially the same regardless of whether the employer changes insurance carriers. I agree with the panel that, in reaching this conclusion, the arbitrator was arguably construing the agreement. In fashioning relief, however, rather than simply find that the employer has the obligation to keep benefits substantially the same and to notify, explain to, and discuss with the union regarding changes in benefits, all that is required by section 12.7 when there is a change in carriers, the arbitrator added the additional

- 13 -

requirement that the employer must first obtain the union's consent before implementing a change

in benefits, a requirement not found in the agreement nor one rationally derived from it.

It is true, of course, that the employer could arbitrate the union's failure to consent to a

proposed change in coverage that the employer believes results in substantially the same benefits.

However, the arbitrator's requirement that the employer first get the union's consent before

implementing the change shifts the burden of who must initiate arbitration to the employer and, thus,

strips from the employer the right to first implement a change to the insurance coverage.[4] The union

argues, in response, that the agreement does not give the employer the unfettered right to change

insurance coverage, and, since the contract is silent on what the employer's rights or limitations are

when it changes benefits without changing carriers, the arbitrator was permitted to bring her

informed judgment to bear to fill this gap by concluding that the employer must first get the union's

consent before changing benefits.

It does not follow from the fact that the agreement does not accord the employer the

affirmative right to change coverage that the employer in fact does not have that right. Rather, where

an agreement between management and a union is silent on a subject, management retains discretion

over that subject. As the Supreme Court noted:

---

[4] The union's "statement of the grievance" supports the interpretation that although the benefits must remain substantially the same, the employer may initially change the benefits. The grievance reads, "Employer changed insurance and [benefits are] not substantially the same as previous coverage." The union simply asked the arbitrator to determine whether the employer's change in benefits resulted in benefits that were not substantially the same as previous coverage, and, if so, to make the union's members whole. By requiring that the employer first obtain the union's consent before implementing a change in benefits, the union received more than it even asked for.

- 14 -

> Collective bargaining agreements regulate or restrict the exercise of management functions; they do not oust management from the performance of them. Management hires and fires, pays and promotes, supervises and plans. All these are part of its function, and absent a collective bargaining agreement, it may be exercised freely except as limited by public law and by the willingness of employees to work under the particular, unilaterally imposed conditions.

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583 (1960). We had the opportunity to apply this language from *Warrior & Gulf* in *Appalachian Regional Healthcare, Inc. v. United Steelworkers of America*, 245 F.3d 601 (6th Cir. 2001). In *Appalachian*, a dispute between an employer and the union representing its employees concerning the employer's authority to require part-time employees to work more than their scheduled shifts was submitted to an arbitrator. 245 F.3d at 603-04. The arbitrator concluded that the employer could not require part-time employees to work more than their scheduled shifts because "[t]here is no provision [in the collective bargaining agreement] *permitting* the Employer" to do so. *Id.* at 606 (emphasis in original). This Court reversed, holding that the "arbitrator created a limitation on [the employer]'s management rights that is not found in the Agreement." *Id*. In reaching this conclusion, we noted that a collective bargaining agreement "need not include provisions permitting management action on every conceivable employment matter; rather, on issues not discussed in the Agreement, management retains discretion." *Id*. (citing *Warrior & Gulf Navigation Co.*, 363 U.S. at 583). Similarly, the fact that there is no affirmative language in the collective bargaining agreement "permitting" the employer here to change insurance coverage does not support the conclusion that the employer is without the authority to do so.

Furthermore, although the agreement does not give the employer the unfettered right to change insurance coverage, but rather is silent on what must be done when the employer changes coverage without a corresponding change in carriers, this does not give the arbitrator free reign to craft a remedy devoid of any connection to the agreement. Rather, in crafting the remedy, the arbitrator must arguably be construing the agreement.

If the arbitrator need not (or did not) interpret section 12.7's "notice, explain, and discuss" provisions as applying to the context here where there was not a change in carriers (even though the arbitrator did interpret section 12.7's "substantially the same benefits" provision as applying to this context), then it is difficult to discern how the arbitrator was at all construing the contract. The arbitrator does not point to any other provision in the agreement that it relied upon in fashioning her award. Rather, she simply asserts the following:

> "Health insurance benefits are an integral and critical component of the employees' working conditions. . . . Management has an obligation not to erode those benefits; the [union] has a duty to preserve them. Consequently, the provisions of the insurance package must be protected from unilateral action by the employer. Management must notify the [union] about contemplated modifications and seek its approval."

This conclusion does not rely upon the parties' agreement. If the arbitrator did not rely upon the agreement in fashioning relief, then her requirement that the employer must first obtain the union's consent before implementing changes to insurance coverage would simply reflect the arbitrator's own brand of industrial justice. The prohibition against an arbitrator dispensing her own brand of industrial justice was forcefully stated by the Supreme Court in *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960) (emphasis added):

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. The draftsmen may never have thought of what specific remedy should be awarded to meet a particular contingency. *Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.*

363 U.S. at 597 (emphasis added). Thus, although we must certainly give the arbitrator a fair share of deference in fashioning relief, if the relief awarded by the arbitrator is not derived from the interpretation and application of the agreement, or even a single provision in the agreement, such as section 12.7, then the award must be vacated.[5]

If the arbitrator was interpreting section 12.7's "notice, explain, and discuss" provisions when crafting the remedy, then it is difficult to see how the arbitrator's requirement that the employer also obtain the union's consent before implementing a change to insurance coverage could be anything but an additional requirement not found in or rationally derived from the agreement. Our decision in *Ford Motor Company v. Plant Protection Association National*, 770 F.2d 69 (6th Cir. 1985) is

---

[5] In *Beacon Journal Publishing Company v. Akron Newspaper Guild*, 114 F.3d 596, 600-601, cited by the majority, we reversed the arbitrator's substantive decision that the employer violated the agreement when it scheduled vacations because the employer had the specific right in the agreement to do so. However, we vacated the arbitrator's *award* because the union was "[u]nable to point to a contractual basis" supporting it. *Id.* at 601. We noted that "the arbitrator imposed his own brand of 'industrial justice' . . . by crafting [an award] that do[es] not even arguably derive [itself] from the contract." *Id.* at 600. Rather, we continued, "[i]t appears that the arbitrator imposed [this award] in an effort to form a 'better solution' for the parties than that which could be found in the terms of the agreement itself." *Id.* This, we noted, "is in direct contravention of the principle that awards not be based on principles of fairness, but instead on precise terms of the collective bargaining agreement." *Id.* Similarly, if the arbitrator was not interpreting section 12.7 as applying here where there is a change in coverage but not a change in carriers, then the arbitrator's award would erroneously be based on principles of fairness and not on the precise terms of the collective bargaining agreement.

analogous.  In *Ford Motor*, the agreement between the union and Ford provided that "where the introduction of new or advanced technology at a plant location affects the job responsibilities of included employees, local management will discuss the matter with the Union.  Such discussion will take place in advance of implementation of such technological change as is practicable."  770 F.2d at 72.  From this language, the arbitrator found that "Ford [had] agreed . . . to meet and discuss new technology with [the union] before adopting it." *Id*. at 73.  The arbitrator then went on to order Ford to "bargain such changes affirmatively." *Id*. at 73.  We reversed, noting that "[t]here was nothing in the agreement . . . which required Ford to bargain either affirmatively or otherwise on this matter." *Id*. at 75.  We concluded that the "arbitrator exceeded his authority in requiring Ford to bargain affirmatively" as "[t]his award imposed an obligation on Ford not found in the agreement." *Id*. at 75.  Similarly, here,  the only provision of the agreement that deals with insurance provides only that the employer must give the union notice of a change and explain and discuss all maters related to the change.  The arbitrator's requirement that the employer first obtain the union's consent before implementing a change thus adds an additional requirement not found in the agreement.

Since I believe that the arbitrator was not arguably construing the contract in requiring the employer to obtain the union's consent before implementing a change in coverage, but rather added an additional requirement not found or rationally derived from the agreement but based solely upon the arbitrator's own view of industrial justice, I respectfully dissent.